FILED
2014 May-16  AM 11:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**LAWRENCE ROSEN, M.D.,**

> **PLAINTIFF,**

**vs.**                                          **CIVIL ACTION NO: _____**

**UNUM PROVIDENT CORPORATION**
**a/k/a THE UNUM GROUP,**

> **DEFENDANT.**

## COMPLAINT

COMES NOW, Dr. Lawrence Rosen, M.D. ("Dr. Rosen"), by and through his undersigned counsel, hereby files this Complaint against Defendant UNUM Provident Corporation a/k/a The UNUM Group ("Unum"), and alleges as follows:

## JURISDICTION

1.     This Court has jurisdiction over the parties by diversity of citizenship of the parties and because the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest, costs and attorney's fees.

2.     This action also seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2022.

3.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391 (b) and (c).

## PARTIES

1.     Dr. Rosen is an individual over the age of eighteen (18) and is a resident of Anniston, Alabama.  He is a board certified urological surgeon.

2.     UNUM Group is a foreign corporation doing business in Alabama with principal offices in Chattanooga, Tennessee, and is the claim administrator for the disability policy at issue.

3.     UNUM Group was formed in 1999 by the merger of Unum Corporation, an insurer based in Portland, Maine, with the Provident Companies, Inc., a Delaware Corporation, an insurance holding company based in Chattanooga, Tennessee.

4.     Upon information and belief, at all times since the merger in 1999, all claims handling procedures and operations were prescribed in a unitary and coordinated fashion by Unum for all its subsidiaries and controlled companies.

## FACTS

5.      In the fall of 1989, Dr. Rosen met with a Provident sales representative that marketed and promoted a Provident disability insurance policy for Dr. Rosen to purchase.

6.      Provident's disability policy was specifically marketed to high-wage white-collar workers, such as Dr. Rosen, because it promised to pay total disability benefits if the policyholder was unable to perform the duties of his given specialty ("own occupation"). The Provident salesman explained to Dr. Rosen that the "own occupation" definition of disability meant that Provident would pay the policyholder disability benefits when the policyholder could not perform specific duties necessary for his specialty even if the policyholder was physically capable of performing other activities or working outside of his specialty.

7.      In reliance upon this marketed feature of the Policy, Dr. Rosen purchased his disability insurance from Provident and stopped investigating other disability policies with other carriers.[1]

8.       The "own occupation" definition was the integral fact upon which Dr. Rosen based his decision to purchase the policy and pay higher premiums because he was a board certified urology surgeon.

9.      On or about January 25, 1990, in reliance on the representation that Provident would pay total disability benefits if he was no longer able to

---

[1] The Policy was issued by Provident Life, but as discussed above in ¶¶ 10 & 11, Provident Companies, Inc. merged with Unum in 1999.

perform urological surgery, Dr. Rosen applied for a disability Policy with Provident.

10.     On or about April 17, 1990, Provident issued Dr. Rosen the disability policy, #06-337-7028896.

11.     Pursuant to the Policy, Provident – now Unum Group (hereinafter 'Unum') -- is obligated to pay the "Monthly Benefit for Total Disability" starting on the day of total disability after the insured satisfies the "elimination period" during which he was totally disabled as a result of injury or sickness.

12.     Specifically, Unum is obligated to pay Dr. Rosen his total disability payment of $19,300 per month whenever he is "unable to perform the substantial and material duties of his occupation."  Unum is required to begin these payments 180 days from the date of end of the elimination period. (The elimination period is 180 days.)

13.     Since purchasing the policy in April 1990, Dr. Rosen has dutifully paid all premiums and has fulfilled all his requirements as a policyholder under the disability insurance policy from Unum (the "Policy").

14.     On or about June 6, 2006 Dr. Rosen began seeing a physician because he was experiencing leg weakness and severe pain.

15.    On or about October 30, 2006 Dr. Rosen's doctor began treatment for his leg weakness and pain.

16.    On or about June 2008 Dr. Rosen was diagnosed with piriformis syndrome, which results in weakness in his legs and severe, unrelenting pain which prevents him from standing for significant periods of time.

17.    At all material times since 2008, Dr. Rosen has been under the regular and personal care of a physician.

18.    On or about April 1, 2009, Dr. Rosen stopped working full time due to his chronic, extreme pain and his inability to stand for prolonged periods. Dr. Rosen only worked approximately 24 hours a week as of April 1, 2009.

19.    In 2011 Dr. Rosen's physician directed that he cease all invasive surgical procedures due to the high risk of danger to the patients.

20.    On or about June 2011 Dr. Rosen filed his initial disability claim with Unum.  In his claim he stated that he had been working part time since April 1, 2009 and that he was unable to perform surgery.

21.    In his June 2011 disability application to Unum, Dr. Rosen stated that his job required frequent standing, sitting, balancing and bending as well as requirements that he: work under emergency conditions, have cognitive attention to detail, meet deadlines, and make independent decisions.

5

Because his condition prevented him from performing these requirements, he was unable to conduct emergency surgery or perform critical care for his patients.

22.    On or about August 1, 2011, UNUM wrote Dr. Rosen requiring him to have his physician submit an Attending Physician's Statement ('APS') in order for UNUM to begin its review of Dr. Rosen's claim.

23.    Dr. Rosen's physician completed and signed UNUM's APS on September 28, 2011 and faxed it to UNUM on October 10, 2011.  In that statement, Dr. Rosen's physician affirmed that he last examined Dr. Rosen on September 22, 2011, that Dr. Rosen's diagnosis was piriformis syndrome, and that Dr. Rosen was "temporarily, totally disabled until further notice." Additionally, he referenced his previous office notes for further support for Dr. Rosen's condition.

24.    On or about October 13, 2011, Unum sent Dr. Rosen a letter in which it provided a claim summary and requested additional information. Specifically, Unum stated that it understood that Dr. Rosen had **not** experienced a 30-day period of Total Disability since April 2009 and requested that Dr. Rosen advise it if this was not true.

25.    In that October 13th letter, Unum also required Dr. Rosen produce the following:

1. Written explanation as to why he did not file his claim sooner.

2. A summary of all CPT codes for the periods in the enclosed instructions.

3. Complete personal and business tax returns from 2004-2010 for all businesses, including W-2s, K-1's and attachments.

4. Monthly profit and loss statements for all businesses for January 1, 2011 to the present – and all months going forward.

26.    On or about October 20, 2011, Dr. Rosen responded by letter and told Unum that he had not filed the claim earlier because he had hoped he would get better and recover.  Dr. Rosen also told Unum that he **had** experienced 30 days of total disability in which he was unable to perform the substantial and material duties of his occupation – from August 20, 2009 to September 24, 2009.  Additionally, he asked Unum what CPT codes they were requesting.

27.    On or about November 7, 2011, Unum requested that Dr. Rosen complete a Status Update form and have his physician complete another APS in order for Unum to "get an understanding of [his] current treatment and condition."

28.    On or about November 28, 2011, Dr. Rosen completed the Status Update form and faxed it to Unum.  In that update form, Dr. Rosen

again stated that he was no longer performing surgery but was only doing minor procedures in the office and conducting office visits on a part-time basis.

29.   Dr. Rosen's physician completed the APS and faxed it to Unum on December 16, 2011.  In the APS, Dr. Rosen's doctor stated that Dr. Rosen was 'Totally Disabled' and that there was no medical change in Dr. Rosen since his last report.

30.   On or about December 19, 2011, UNUM wrote Dr. Rosen and informed him that Unum had determined that his disability date was April 1, 2009 and that his elimination period ended September 28, 2009.

31.   The December 19th letter also stated that Unum had denied Dr. Rosen Total Disability payments and that Unum would only pay him Residual Disability benefits, which were considerably less than the Total Disability benefit Provision of $19,300/month.

32.   Unum stated that it based its decision to deny Dr. Rosen Total Disability payments on its internal review of Dr. Rosen's CPT codes.

33.    Since Unum was only paying Residual Disability benefits, it required Dr. Rosen to produce detailed, accounting records for the prior five (5) years as well as ongoing monthly profit and loss detail so it could

calculate Dr. Rosen's monthly loss of earnings upon which it would calculate the Residual Disability benefit it would pay.

34.     At all times material hereto, Dr. Rosen has suffered from the major medical condition of piriformis syndrome, which causes continuous pain and muscle spasms throughout his lower back, buttocks and legs.

35.     As a result of this condition, Dr. Rosen cannot stand without severe pain and he is forced to remain seated throughout the majority of each day.

36.     In order to perform the surgeries required by his specialty, Dr. Rosen must be able to stand for extended periods of time and squat and bend with ease.

37.     Dr. Rosen's medical condition has rendered him unable to perform surgery, which was a primary and substantial duty of his occupation as a urological surgeon.

38.     Since 2011, upon the direction of his doctor, Dr. Rosen no longer performs any surgery or invasive procedures and therefore can no longer practice as a urological surgeon.

39.     At all times material hereto, Dr. Rosen has been and continues to be totally disabled from his occupation and medical specialty under the terms and conditions of the Policy.

40.     Dr. Rosen has complied with all conditions precedent to recover the benefits under the Policy, or all conditions precedent have otherwise been performed or have been waived or excused.

41.     Dr. Rosen was born on December 19, 1951 and he filed his application for individual disability in June, 2011.

42.     Because Dr. Rosen became totally disabled prior to his 61st birthday, UNUM is obligated to pay $19,300 per month until Dr. Rosen turns 65 years old.

43.     Dr. Rosen's policy defines "total disability" as:

Total Disability or totally disabled means that due to Injuries or Sickness:

    1.    you are not able to perform the substantial and material duties of your occupation; and
    2.    you are receiving care by a Physician which is appropriate for the condition causing the disability. . . .

44.     The Policy further states that:

    [Y]our occupation means the occupation (or occupations, if more than one) in which you are regularly engaged at the time you become disabled. If your occupation is limited to a recognized specialty within the scope of your degree or license, we will deem your specialty to be your occupation.

45.     At this point, Dr. Rosen had been paying UNUM premiums for the Policy for over twenty years.

46.    Based on Unum's calculations and review of Dr. Rosen's CPT codes, Unum decided that Dr. Rosen's surgeries accounted for 51% of his charges, so it was entitled to deny him total disability status.

47.    Dr. Rosen's policy does not mention the right of Unum to use CPT codes to deny or determine disability.  In fact, CPT codes are not mentioned in the policy under which Dr. Rosen is insured.

48.    Unum acknowledged that there was a decline in Dr. Rosen's overall production beginning in April of 2009 and a decline in his surgical charges.

49.    Despite this reduction in surgery and in revenue, Unum used its internal calculation of CPT codes to deny Dr. Rosen his total disability benefits.  Despite the terms of the policy, Unum declared that it would only pay Dr. Rosen the base benefit under the "Residual Disability" provision of the Policy instead of the "Total Disability" provision.

50.    Unum sent a check to Dr. Rosen for "six months of benefits at 50% of [his] base benefit" and stated that, should Dr. Rosen have greater than a 50% loss of earnings, Unum would provide him with any additional benefits that may be due to him.

51.    Since its initial determination that Dr. Rosen is only partially disabled, Unum has spent the past two years making repeated requests to

Dr. Rosen for unnecessary information unrelated to the determination of disability.   These harassing and duplicative requests include extensive financial information, personal and business tax returns, pension expenses, profit and loss statements, a list of his duties performed for additional business organizations, profit-sharing contributions, and information regarding insurance reimbursements relating to property damage.

52.     Unum has even gone so far as to request a 1-2 hour in-home interview of Dr. Rosen, in which he was to be asked about his "current condition, medications, doctor visits, and any current or new treatment plans" and the impact of his disability on his daily activities.

53.     These past two years of claims investigations have continued despite the continuing assertion by Dr. Rosen's physician that states Dr. Rosen is totally disabled and despite the obvious, drastic reduction in Dr. Rosen's revenue.

54.      Dr. Rosen has been a licensed, urological surgeon for over 25 years, and has continuously held himself out as such for that same period.

55.     Dr. Rosen can no longer perform surgery or invasive procedures, and thus can no longer be a urological surgeon.

56.     Dr. Rosen has provided Unum with numerous attending physician reports, all of which state that Dr. Rosen is "totally disabled" and

has provided UNUM with detailed income and profit/loss statements from his company that show a drastic reduction in revenue.

57.     Upon information and belief, Unum has used its own self-serving calculations of Dr. Rosen's CPT data to disqualify Dr. Rosen from receiving benefits under the "total disability" provision of his policy. Unum's denial of Dr. Rosen's total disability is contrary to its policy provision that promises total disability when the insured is unable to complete substantial and material duties of the insured's occupation.

**UNUM'S RICO SCHEME - INCREASE PROFIT BY DENYING CLAIMS**

58.     Upon information and belief, in the 1980s, CD interest rates were high, and Unum intended to engage in and did engage in a practice known as "*cash flow underwriting,*" in which it attempted to generate as much premium receipts as possible without concern for the nature of the risk it chose to insure under the polices and, instead, sold as many polices as it could with the intention of making a profit by investing the premium dollars in the marketplace, rather than by carefully setting premium rates and screening the risks it took on.

59.     Upon information and belief, Unum thus crafted its policies to make them especially alluring to customers in order to maximize the initial intake of premiums without regard to risk.

60.    Upon information and belief, by the early 1990s and due to Unum's liberal underwriting and marketing, Unum controlled a larger percentage of the long-term disability insurance market than any other insurance company in the country.

61.    Upon information and belief, in the early 1990s, the disability policies sold by Unum to the long-term, individual "Own Occupation" insurance block had begun to generate high levels of payable claims.

62.    Upon information and belief, in 1993 interest rates declined sharply, causing the financial assumptions that Unum used to set pricing and claim reserves for those polices to become invalid, i.e., the investment return of the premium dollars generated by the cash flow approach to underwriting was insufficient to allow Unum to profit from this practice.

63.    Unum began losing money on this line of coverage because of payable claims on the long-term, individual "Own Occupation" type policies.

64.    Upon information and belief, around 1995, Unum discontinued the sale of new, non-cancellable, guaranteed renewable, long-term, individual "Own Occupation" disability policies, such as the Policy purchased by Dr. Rosen.

65.    As the result of the financial impact of claims on the disability policies it sold to long-term, individual "Own Occupation" policyholders,

Unum adopted a practice, pattern and policy of wrongfully and intentionally denying disability claims filed by long-term, individual "Own Occupation" policyholders.

66.    The public record shows that Unum's relationships with its disability policyholders, particularly those with long-term, individual "Own Occupation" Policies like Dr. Rosen's, suffered through the 1990s through the present and that thousands of lawsuits alleging bad faith denial of coverage claims were filed against Unum and its subsidiaries during that time. Nevertheless, Unum continued to charge Dr. Rosen the same premium for this coverage and he continued, and still continues, to pay premiums for that coverage.

67.    In or about 1995, in response to the significant financial losses it suffered as the result of disability claims with "Own Occupation" Policies, Unum instituted an intensive joint claims/legal special review process to target high end claims and terminate them.

68.    Upon information and belief, the goal of Unum's new claims programs was to increase, by at least ten percent, the dollar value of policy termination over the previous year and to achieve terminations of claims valued at $132 million in the third quarter of 1995.

15

69.    Upon information and belief, in or about May 1995, Unum terminated 57 claims for which it had set up a reserve of $40 million. Unum thus had begun to meet its goals for terminating claims.

70.    Upon information and belief, Unum determined that due to the significant financial leverage associated with individual, long-term "Own Occupation" disability claims, such as the claim at issue in this litigation, the return on the claim initiatives described above would be substantially favorable to Unum without regard to the rights of the insured.

71.    Upon information and belief, after instituting its intensive joint claims/legal special review process designed to improperly and illegally terminate claims described above, Unum turned a profit in 1995.

72.    Upon information and belief, Unum hired consultants and law firms to create and institute a consistent scheme to maximize profits by illegally denying disability claims. Upon realizing its ability to make a profit by illegally denying proper claims, Unum has continued its corporate policy of aggressively seeking to deny individual "Own Occupation" disability claims of its policyholder/claimants in order to protect Defendants' own financial and self-serving interests.

73.     This scheme is a gross violation of Unum's statutorily mandated fiduciary responsibility as insurance providers and is designed to "steal" payouts to otherwise proper claimants by illegally denying claims.

74.     At no time between 1991 and 2002 did Unum ever disclose to Dr. Rosen that it had suffered a $17 million loss in its statutory earnings as the result of claims under the same type of "Own Occupation" Policy for which Dr. Rosen was paying premiums.

75.     Unum never disclosed to Dr. Rosen that it had adopted unethical or illegal practices and an intensive joint claims/legal special review process intended to facilitate termination of claims or that if Dr. Rosen, in the future, made a claim for disability coverage, Unum would make every attempt possible to deny the claim under its new internal process and procedures, for any attainable reason.

76.     Unum never informed Dr. Rosen that it had been named as a defendant in thousands of lawsuits nationwide during this period of time, arising out of its intentional and unlawful denial of income disability insurance claims.

77.     Unum did not charge Dr. Rosen a lower premium for the Policy he renewed after 1995, despite the change in internal policy and marked alteration of Unum's intent under the contract.

78.    While Unum charged Dr. Rosen the same or greater premiums than he had paid prior to 1995, Unum knew that Dr. Rosen would have less of a chance of recovering on a claim made for disability benefits after 1995 than he would have had he made a claim for disability coverage prior to 1995, and therefore, that effectively Dr. Rosen had less or no coverage.

79.    Unum carried out and implemented its illegal Scheme by improperly targeting high reserve "own occupation" benefits claims for denial or termination, subjecting Dr. Rosen and others to abusive and sham claims practices and procedures.

80.    Since at least 1999, Unum has implemented an enterprise wide, intentionally aggressive and deceitful approach to claims handling in order to increase profits and meet financial goals and desired "net termination ratios" (the proportion of terminated claims to new claims), without regard to the actual merits of the disability claims.

81.    Upon information and belief, said approach was introduced by then Senior Vice President of Customer Care Ralph Mohney and then CEO J. Harold Chandler.

82.    As a result of this Scheme, Unum's senior management closely monitored, directed and unethically intervened in the claims review and

decision-making process, allowing for minimal discretion and autonomy on the part of the claims handlers.

83.    Failure of claims handlers, including physician reviewers, to follow the directives of senior management, even when the claims recommendation was inappropriate given the supportive claims data, resulted in negative employment consequences including termination. Conversely, claims handlers were rewarded and promoted based upon achievement of claims termination and denial goals.

84.    Defendants adopted and implemented "roundtables" as a tool to brainstorm and formulate causes to deny claims. Specifically, "roundtables" were used to target ongoing claims with high reserves in order to save Unum money. Claims adjusters were looked upon favorably if they brought claims to the roundtables. No minutes of the roundtables were kept or included in the claims file, and attendees were instructed to destroy any review sheets and notes after each meeting.

85.    Upon information and belief, the majority of claims addressed at the roundtables were "own occupation" disability claims involving professionals exactly like Dr. Rosen.

86.     Unum adopted and implemented "blitz searches" to meet monthly financial projections. Blitz searches involved a requirement that senior managers conduct a search for claims to terminate.

87.     Upon information and belief, senior managers were expected to regularly identify high reserve claims to deny or terminate.

88.     Unum adopted and implemented enterprise-wide policies prohibiting doctors from expressing their opinions regarding the disability status of claimants in the claim file.

89.     Unum frequently ordered its doctors to amend, supplement or rewrite a medical report in order to accommodate the demands of senior managers to support claim denials or terminations, in blatant violation of its ethical duties and the doctor's own ethical responsibilities.

90.     Unum's history of destroying documents relevant to the claims review is well documented as is its failure to conduct full and fair review of claim evidence, failing to inform claimants of information that could be supplied to perfect their claims and making claim decisions based upon Unum's business needs rather than the merits of the claim.

91.     The basic elements of the Scheme, criminalized under Federal Law as detailed below, are predicate racketeering acts under the Federal RICO Statutes, as well as "dishonest" claims handling under the insurance

contracts being administered. Those basic elements are classifiable as follows:

a)  "Post-claim underwriting," a dishonest approach to seeking to find an excuse or rationale for denial, termination or settlement under onerous conditions, by means of specious construction of contract language and changing the meaning of contract terms from a construction adhered to when the contract was signed to a new and self-serving construction used at the time of the filing of a claim;

b) Forming internal committees, including roundtables and other internal groups, assigned to target higher value claims, such as Dr. Rosen's, not for fair evaluation or review, but to find a way to deny, terminate or settle them, and managing those committees to achieve the elimination, on a monthly and quarterly basis, of a quota percentage dollar value of claims payable or being paid solely in order to reach a desired bottom line result;

c) Denying, terminating or settling claims under onerous conditions on the basis of unfounded internal opinions or evaluations from an inadequate and/or distorted record

improperly constructed by Unum's employee medical doctors and staff;

d) Denying, terminating or settling claims under onerous conditions on the basis of internal opinions or evaluations by Unum's employee medical doctors, adjusters and staff who rendered specious, biased and unfounded opinions on an inadequate and/or distorted records after ignoring the opinions of treating or independent physicians;

e) Ignoring facts and considerations favorable to claimants, leading to the denial, termination or settlement under onerous conditions of claims which were entitled to be honored;

f) Soliciting specious, biased and unfounded medical opinions from purportedly independent medical examiners (IMEs) who were, to Unum's knowledge, likely to be biased in Unum's favor, and furnishing those IMEs with skewed, censored and sanitized files in order to achieve a pre-determined result favorable to Unum;

g) Developing new meaning and parameters for Policy terms in order to better enable the denial, termination or settlement under onerous conditions of claims, instead of fairly and

honestly adopting the result dictated by a fair and honest reading and evaluation of the claim in light of the Policy language as accepted and interpreted as of the time of the issuance of the Policy in question;

h) Trapping claimants into an alleged default in an obligation under the Policy to provide information, including excessive and/or duplicate financial and other information and repeated, pointless and oppressive or painful medical examinations, by requiring such information in a time frame virtually guaranteed to create a significant percentage of defaults by claimants, with those defaults leading to claim denial, benefit termination or onerous settlement;

i) Using its vastly superior bargaining power and hard-ball litigation tactics as weapons to promote unreasonable buyouts of claims and policies; and concealing disclosure of fiduciary misconduct by demanding confidentiality agreements;

j) Using hard-ball litigation tactics and threats of counterclaims known to be frivolous as a weapon to promote unreasonable buyouts of claims;

k) Using knowingly specious and frivolous evaluations as to extent and length of disability in order to deny, terminate or settle, under onerous conditions, legitimate claims;

l) Using knowingly specious and frivolous contentions as to facts relevant to other than medical and the extent of disability considerations in order to promote the denial, termination or onerous settlement of legitimate claims;

m) Engaging in a systematic and improper censoring and sanitizing of claim files to preclude the inclusion of those files of data and evidence favorable to claimants, thereby aiding in the denial, termination or onerous settlement of legitimate claims;

n) Promoting and directing the compilation of incomplete and deceptive files in anticipation of litigation, knowing that those incomplete and deceptive files would be offered as evidence in various courts;

o) Violating its fiduciary obligations on behalf of claimants through the pursuit of explicit policies unconnected with the legitimate determination of issues and designed solely to

deny, terminate or settle under onerous conditions legitimate claims;

p) Employing various forms of incentive fees and awards and claims handling procedures to improperly and illegally terminate claims and transfer of claims authority from physicians to claims personnel to make claims determinations;

q) Pressuring and explicitly and implicitly threatening claims personnel and internal adjudicators with employment sanctions and loss of their jobs unless they cooperate in the perpetration of the Scheme and rewarding illegal and immoral conduct including improper termination of claims with bonuses or prizes;

r) Focusing on long-term disability claims with high reserves, exactly like Dr. Rosen's claim where the insured was a disabled "own occupation" policyholder that had been or would otherwise rightfully be receiving benefits for months, years or lifetime;

s) Upon information and belief, on May 22, 1995, Senior Vice President in charge of Customer Care Ralph Mohney sent a

memorandum to then CEO J. Harold Chandler addressing the goal of denying and terminating claims which would, in turn, provide a corresponding increase in annual savings to the company.

t) Upon information and belief, as set forth herein, Unum has and continues to conduct its affairs through unethical and fraudulent insurance claims processing standards, in order to decrease the money reserves on claims, maximize corporate and shareholder profits and benefit personally from the denial of meritorious, long-term "own occupation" disability claims.

u) Upon information and belief, Unum knowingly conducted its affairs through a comprehensive and unlawful Scheme to defraud Dr. Rosen, and other similarly situated beneficiaries of long-term "own occupation", disability policies issued by Unum, out of their benefits to which they were otherwise rightfully entitled to receive, under their policies.

v) Unum has consistently utilized unethical claims handling practices despite being repeatedly fined and chastised by state after state and court after court because they have

determined that they can make a profit by these illegal practices despite the fines and punitive jury awards.

w) Unum has not stopped these practices and is doing the same thing to Dr. Rosen.

92.    Unum has been perpetrating the Scheme as a plan, and its general business practice has by now become almost common knowledge, with initial exposes by NBC's "Dateline" in October of 2002 and CBS's "60 Minutes" in November of 2002, and with the tone of the numerous Federal Court findings such as *Radford Trust v. First Unum Life Insurance Company of America,* 321 F. Supp. 2d 226 (D. Mass. 2004), wherein Chief Judge Young included an extraordinary Footnote 20 listing 33 federal cases across the country which have found Unum's claim handling reprehensible, and in *Greenberg v. Paul Revere Life Insurance Company,* 91 Fed. Appx. 539 (CA 9th (Ariz.) 2004), where the Court of Appeals opined that the plaintiff had "proffered ample evidence that Unum Subsidiary Paul Revere acted with the 'evil mind' necessary to support a punitive award under Arizona law."

93.    That the Scheme and use of at least some of its techniques have been employed by Unum and its predecessors prior to 1999 and are still being perpetrated on a continuous basis is evidenced by the temporal and geographical range of cases cited in *Radford Trust's* Footnote 20.

94.     Unum's business practices in denying disability claims drew the attention of Elliot Spitzer, New York's former Attorney General, who conducted an independent investigation. The U.S. Department of Labor also conducted an inquiry into Unum's claims handling. A Multi-state Market Conduct Examination by 47 states and two other jurisdictions was led by Unum's home states of Maine, Massachusetts and Tennessee. A settlement was reached short of finding any violations of law upon voluntary payment of a $15 million fine paid to the regulators and promises to institute certain safeguards to benefit claimants. Unum CEO Thomas R. Watjen signed the agreement on November 18, 2004. No such safeguards were instituted.

95.     Under the Settlement Agreement, no direct financial benefit inures to the plaintiff, Dr. Rosen, and the thousands of victims of Unum's improper conduct unless the judicial system in this case permits evidence to be presented to demonstrate that the predicate acts are legally sufficient to invoke RICO penalties of treble damages.

96.     Juries have awarded bad faith punitive damages to numerous individuals for Unum's conduct such as $84.5 million (Joanne Ceimo), $7.67 million (Joan Hangarter), $31.7 million (Randall Chapman), $36.7 (John A. Tedesco, M.D.).

28

97.     Thousands more of these types of lawsuits exist throughout the country, but UNUM hopes to hide from public view its multiple legal abuses in closed and open claims and lawsuits by coordinating its outside counsel in yearly seminars to institute a pattern and practice of demanding and securing confidentiality agreements from claimants exhausted by expensive litigation.

98.     UNUM coordinates its outside counsel through the aforementioned yearly seminars as well as through an "*Outside Guide to Counsel*," which informs its outside counsel that a Unum representative must review all briefs, motions, substantive pleadings, discovery responses and settlement offers, and that Unum will not pay for any work which does not "advance the ball."

99.     This *Outside Guide to Counsel* has been held to be in violation of local rules of practice and Federal Rule of Civil Procedure because it "hamstrings the lawyer charged with defending the claim," and it "seems to be based upon the erroneous presumption that litigation is like chess, the object is to win by anticipating the opponent's moves to the point that the opponent has no place to turn and must then concede," *Frederick v. Unum Life Ins. Co.,* 180 F.R.D. 384 (D. Montana Missoula Div. 1998). *Frederick*

also stated "litigation is not a game in which counsel are paid only where they 'advance the ball.'" *Id.*

100.   These actions by Unum are intended to pervert and obstruct justice by manipulating the judicial system to achieve its own commercial ends regardless of Unum's ethical duties towards its policyholders to conduct claims practices and even litigation in a fair manner.

101.   The United States District Court for the Northern District of California in *Joan Hangarter v. The Paul Revere Life Insurance Company, et al.,* 236 F. Supp. 2d 1069 (N.D. Cal. 2002), entered specific findings of fact and conclusions of law establishing that UNUM, "*…developed, with the expertise of Ralph Mohney, a comprehensive system of targeting and terminating expensive claims.*"

102.   Upon information and belief, Dr. Rosen is a victim of the same and continuing "*…comprehensive system of targeting and terminating expensive claims.*"

103.    Additionally, in *Radford Trust v. First Unum Life Ins. Co. of Am.,* 321 F. Supp. 2d 226 (D. Mass. 2004), the court went to great lengths to explain UNUM's underhanded dealings with policyholders/claimants. The court in *Radford Trust* stated in relevant part:

> This is not the first time that First UNUM has sought to avoid its contractual responsibilities, and an examination of cases involving First UNUM and UNUM Life Insurance Company of America, which like First UNUM is an insuring subsidiary of UNUM Provide Corporation, **reveals a disturbing pattern of erroneous and arbitrary benefit denials, bad faith contract misinterpretations, and other unscrupulous tactics.**

> *Id.* at 247 (emphasis added). [Cite correct]

104.   Upon information and belief, Dr. Rosen's claims denial was part of UNUM's deliberate and continuing "*. . . pattern of erroneous and arbitrary benefits denials, bad faith contract misinterpretations, and other unscrupulous tactics.*"

105.   Upon information and belief, UNUM has and continues to hire persons to unfairly review individual, long-term "own occupation" disability claims under express and implicit stipulations that they will only receive bonuses, promotions, parties and other employment benefits if they succeed at denying sufficient individual, long-term "own occupation" disability claims to meet management and corporate goals of reducing money reserves on claims normally set-aside to meet insurance companies' long-term, disability obligations.

106.   Upon information and belief, UNUM continues to promote a policy, practice and pattern of refusing to allow in-house physicians to make independent medical assessments of whether claimants, under individual,

long-term "own occupation" disability policies, were genuinely disabled by pressuring those physicians to review numerous and incomplete files in an inadequate amount of time to achieve medical certainty as to their judgments; by coercing these physicians to "rubber stamp" denials of claims made by claims personnel with little or no medical qualifications; by denying or discouraging the use of IMEs and/or other independent medical tests; and by utilizing salary, bonuses and promotional opportunities to depend upon or be related to each physician's statistics of denying claims with high money reserves exactly like Dr. Rosen's claim.

107.   In 2003 the California Department of Insurance examined Unum's claim practices and issued a fine of $8 million when it found that one of Unum's unethical claims practices improperly targeted medical specialties such as Dr. Rosen's. This report stated:

> The Companies sold coverage for disabilities relating to medical specialties but failed to provide coverage when the claimants could no longer perform their medical specialties. The Companies accomplished this by performing a review of the claimants' medical billing records. If, for example, the billing records indicated the majority of time spent by a surgeon was in consultations, case preparation or follow up check-ups rather than in actual surgery, then the surgeon was not considered disabled if he/she could not longer perform surgery. (No matter that the consultation, review, or follow-up work would not have been generated if the surgeon was not

performing the relevant surgery.) Thus, clearly non-sedentary surgeons and obstetricians who could perform a desk job were determined not to be disabled from their own occupation.

2003 California Department of Insurance Market Conduct Examination

108.   In UNUM's response to this accusation it stated:

The Companies agree to conduct additional training for claims processing personnel regarding the relationship between a non-sedentary component or a practice or another specialty and the ability to maintain a practice consisting of solely the sedentary aspects of that practice. New guidelines will also be developed to assist in the general determination of the ability of the claimant to maintain the specific practice in question.

109.   After a complete analysis, the California Department of Insurance decided that UNUM improperly targeted medical specialties and used specious billing analysis methods to deny claims.

110.   In response to California's DOI findings UNUM agree to re-train their claims handlers, pay an $8 Million fine, and implement new guidelines to stop this practice.

111.   Now, ten years later, UNUM has used this same specious billing analysis to improperly deny Dr. Rosen's claim for total disability.  UNUM's conduct violates its policy provisions and is morally reprehensible, illegal and unethical.

## <u>COUNT I – BREACH OF CONTRACT</u>

The Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

112.    According to the terms of his policy Dr. Rosen is entitled to benefits under the "Total Disability" provision of the Policy which consists of long-term disability benefits until he becomes 65 if he continues to be disabled.

113.    Dr. Rosen is entitled to the benefits identified herein because:

1.    The benefits are permitted benefits under the Policy;

2.    Dr. Rosen has satisfied all conditions to be eligible to receive the benefits;

3.    Dr. Rosen has not waived or otherwise relinquished his entitlements to the benefits.

114.    Despite Dr. Rosen's compliance with the terms of the policies, UNUM has denied Dr. Rosen's claim and unreasonably withheld payments of benefits under the "Total Disability" provision, so as to constitute a breach of contract.

115.    Dr. Rosen has been compelled to obtain the services of attorneys and is entitled to reimbursement for reasonable compensation for their services.

116.   Unum has refused to pay the benefits sought by Dr. Rosen, ignoring the voluminous medical records and clear opinions of his treating physicians and the overwhelming evidence that benefits under the "Total Disability" provision should be provided to Dr. Rosen.

## COUNT II – 18 USC § 1962(a)

The Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

117.   18 USC § 1962(a) states in pertinent part:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through a collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, or to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment and operation of, any enterprise which is engaged in, or the activities which affect, interstate or foreign commerce…

118.   For purposes of this paragraph, Unum is an "enterprise" as defined by 18 USC § 1961(4).

119.   As the enterprise, Unum was also the direct beneficiary of the proceeds from the pattern of racketeering activity.

120.   Unum has engaged in, and its activities have substantially affected, interstate commerce in that it receives interstate disbursements of thousands of dollars in premiums, it markets its policies throughout the country, and commits or cause to be committed perjury in court proceedings to review claims decisions, tampering with the testimony and information to be supplied by witnesses, and otherwise perverting justice.

121.   Dr. Rosen suffered a "racketeering injury" that flowed from the use of Unum's investment of racketeering income. Specifically, had Unum not perpetuated its companywide strategy to wrongfully deny long term disability claims through the investment of racketeering income, a strategy that was conducted through the use of the mails, Dr. Rosen would have had his disability claim honored by Unum.

122.   Furthermore, Dr. Rosen suffered a cognizable "investment injury" that flowed from the use of Unum's investment of racketeering income, in that Unum used such income to undercut competing disability insurers, thus preventing Dr. Rosen from a wider variety of disability insurers with which to choose from, especially disability insurers which would have provided Dr. Rosen with quality service and honored its contractual obligations.

123.   Unum pursued its Scheme to defraud Dr. Rosen by both falsely representing to Dr. Rosen that timely and consistent premium payment would in fact entitle Dr. Rosen to long term disability monthly payments in the event Dr. Rosen suffered a disabling event as defined by the policy and deceived Dr. Rosen by effectuating a company-wide policy in which legitimate claims were wrongfully denied in order to increase profits.

124.   Dr. Rosen reasonably relied on these false representations by not seeking additional disability insurance from an insurance carrier that would have honored said contractual obligations and not wrongfully denied Dr. Rosen's legitimate claim.

125.   By implementing the Scheme as described herein, Unum violated 18 USC §1961 and 18 USC §1962(a).

## CLAIM III – 18 USC § 1962(b)

The Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

126.   18 USC § 1962 (b) states in pertinent part:

> (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

127.   Unum used or invested income derived from their pattern of racketeering activity, in part in acquiring an interest in or operating the enterprise. Specifically, income, i.e., premiums for long term disability benefits, was then used in acquiring an interest in and/or operating the enterprise.

128.   Dr. Rosen suffered a "racketeering injury" that flowed from the use of Unum's investment of racketeering income. Specifically, had Unum not perpetuated its companywide strategy to wrongfully deny long term disability claims through the investment of racketeering income, a strategy that was conducted through the use of the mails, Plaintiff would have had his disability claim honored by Unum.

129.   Furthermore, Dr. Rosen suffered a cognizable "investment injury" that flowed from the use of Unum's investment of racketeering income, in that Unum used such income to undercut competing disability insurers, thus preventing Dr. Rosen from a wider variety of disability insurers with which to choose from, especially disability insurers which would have provided Dr. Rosen with quality service and honored its contractual obligations.

130.   Unum pursued its Scheme to defraud Dr. Rosen by both falsely representing to him that timely and consistent premium payment would in

fact entitle him to long term disability monthly payments in the event he suffered a disabling event as defined by the policy and deceived Dr. Rosen by effectuating a companywide policy in which legitimate claims were wrongfully denied in order to increase profits.

131.   Dr. Rosen reasonably relied on these false representations by not seeking additional disability insurance from an insurance carrier that would have honored said contractual obligations and not wrongfully denied Dr. Rosen's legitimate claim.

132.   By implementing the Scheme as described herein, Unum violated 18 USC §1962(b).

## CLAIM IV – FRAUD

The Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

133.   Dr. Rosen purchased an insurance policy from Unum in 1990 because he wanted to protect his livelihood and family in case he was no longer able to work as a urological surgeon.

134.   Dr. Rosen's primary concern at the time he bought the Policy was the definition of total disability.

135.   As a urological surgeon, Dr. Rosen wanted assurances that his disability policies would cover him if he was unable to work as a urological surgeon and told Unum's agent that this was his primary concern.

136.   Defendant's agent informed Dr. Rosen when he bought the Policy that "if he was unable to perform his duties as a urological surgeon, he would be considered unable to perform the duties of his occupation and would be eligible for total disability."

137.   In reliance, Dr. Rosen purchased the Policy and dutifully paid thousands of dollars in premiums every year.

138.   The statements made by Defendant's agents were misrepresentations of the coverage Unum provided, and in reliance upon the statements, Dr. Rosen purchased his Policy.

139.   From 1994 to date, Unum never disclosed to Dr. Rosen that it adopted unethical or illegal claims handling practices and an intensive joint claims/legal special review process intended to facilitate termination and denial of claims or that if Dr. Rosen, in the future, made a claim for disability coverage, Unum would make every attempt possible to deny the claim under its new internal process and procedures, for any attainable reason.

140.   Unum also never informed Dr. Rosen that it had been named as a defendant in thousands of lawsuits nationwide during this period of time,

arising out of its intentional and unlawful denial of income disability insurance claims.

141.   Every year since 1994 when Dr. Rosen's annual premium was due, Unum accepted Dr. Rosen's premium and failed to inform him that it intended to terminate or deny his claim should one arise. Further, Unum did not charge Dr. Rosen a lower premium for the policies he renewed after 1994, despite the change in internal policy and marked alteration of the intent under the policy, and the relative worthlessness of the policy due to such change.

142.   At the time, Unum charged Dr. Rosen the same or greater premiums than he had paid prior to 1994, Unum knew that Dr. Rosen would have less of a chance of recovering on a claim made for disability benefits after 1994 than he would have had he made a claim for disability coverage prior to 1994, and therefore, that effectively Dr. Rosen had less or no coverage.

143.   Thus, Unum's previous statements to Dr. Rosen regarding his coverage were false or became false.

144.   As a result of Unum's material omissions as to the nature and quality of Dr. Rosen's policy coverage and the expectation that the policy would payout should Dr. Rosen be unable to perform the important duties of

his occupation as an urological surgeon, Dr. Rosen relied on the statements made by Unum because he forewent looking for other insurance policies from other companies and renewed the Policy year after year.

145.   Dr. Rosen was directly damaged by Unum's fraudulent omissions through loss of premiums which Unum collected every year and by loss of income from a payout on the "total disability" provision of the Policy, as well as through the lost opportunity to obtain a disability policy from another company, with any ancillary benefits which would have been provided through that alternate policy.

146.   Dr. Rosen is entitled to recovery of all premiums, plus interest and the benefit of the bargain in terms of disability payments under the contract.

## CLAIM V –  BAD FAITH

The Plaintiff incorporates by reference the previous paragraphs and makes them a part hereof.

147.   On or about April 17, 1990, Dr. Rosen entered into a disability policy with Unum, #06-337-7028896.

148.   The Policy is a valid, in-force contract of insurance between Dr. Rosen and Unum covering the relevant timeframe and losses suffered by Dr. Rosen.

149.   Defining "total disability", the Policy states:

> *Total Disability or totally disabled means that due to Injuries or Sickness:*
>
> *4.    you are not able to perform the substantial and material duties of your occupation; and*
> *5.    you are receiving care by a Physician which is appropriate for the condition causing the disability. . . .*

150.   The Policy further states that:

> *[Y]our occupation means the occupation (or occupations, if more than one) in which you are regularly engaged at the time you become disabled. If your occupation is limited to a recognized specialty within the scope of your degree or license, we will deem your specialty to be your occupation.*

151.   Dr. Rosen has suffered from major medical problems including, but not limited to, piriformis syndrome. These medical problems have rendered him unable to perform the important duties of his occupation as a urological surgeon, as he can no longer stand to perform surgery.

152.   At all times material hereto, Dr. Rosen has been and continues to be totally disabled from his occupation and medical specialty under the terms and conditions of the Policy.

153.   Pursuant to the Policy and as a result of Dr. Rosen's total disability, Unum is obligated to pay Dr. Rosen $19,300 per month until he turns 65 years old. These payments were to begin 180 days after the date of his claim.

154.   Dr. Rosen filed a claim under his Unum Policy for disability benefits on June 2011.

155.   As part of Unum's claim process, Dr. Rosen was obligated to provide multiple revenue statements and statements from his attending physician, which addressed the state and degree of Dr. Rosen's condition and disability.

156.   Since the initial filing of Dr. Rosen's claim in June of 2011, Dr. Rosen's attending physician, Dr. Poczatek, has repeatedly provided up-to-date statements to Unum regarding Dr. Rosen's condition. Each statement clearly notes that Dr. Rosen is "totally disabled."

157.   The revenue statements provided by Dr. Rosen to Unum denote a clear and precipitous decrease in Dr. Rosen's revenue since the onset of his total disability.

158.   Despite Unum's knowledge of Dr. Rosen's diagnosis as "totally disabled" and the substantial decrease in Dr. Rosen's annual income, Unum continues to deny Dr. Rosen the benefits owed to him under the "total disability" provision of the Policy without any reasonably legitimate or arguable reason.

159.   To date, there has been no lawful basis for Unum's refusal to pay Dr. Rosen's benefits under the "total disability" provision of the Policy and

Unum is aware of that fact or intentionally failed to determine any lawful basis.

160.   Unum's refusal to pay Dr. Rosen the benefits he is entitled to under the "total disability" provision of the Policy was and is done in bad faith.

161.   Unum had a duty to "marshal all facts necessary" to make a determination of coverage before its refusal to pay Dr. Rosen the full disability benefits owed to him under the "total disability" provision of the Policy.

162.   Unum breached its duty by not fully investigating Dr. Rosen's claim prior to classifying Dr. Rosen as only partially disabled in its letter on December 19, 2011 and refusing to pay the benefits owed to Dr. Rosen under the "total disability" provision of the Policy.

163.   Unum intentionally or recklessly failed to properly subject Dr. Rosen's claim to a cognitive evaluation or review by not considering Dr. Poczatek's repeated diagnoses of Dr. Rosen as "totally disabled" and the sharp decrease in Dr. Rosen's income following this diagnosis.

164.   Ignoring the aforementioned diagnosis of Dr. Rosen and his decrease in revenue, Unum manufactured an invalid reason to deny Dr. Rosen's claim for benefits under the "total disability" provision of the Policy.

165.   Unum's refusal to pay Dr. Rosen the benefits owed to him under the "total disability" provision of the Policy was and is done in bad faith.

## CONCLUSION

WHEREFORE, premises considered the Dr. Rosen seeks:

(a)     Declaratory judgment that the Dr. Rosen is totally disabled under the terms of his policy.

(b)     Judgment ordering UNUM to pay past benefits plus interest compounded monthly to Dr. Rosen for all months for which he was denied his full disability income of $19,300.

(c)     Declaration that monthly payments of $19,300 per month are due to be paid to Dr. Rosen until he turns 65.

(d)     Reasonable attorneys' fees for representation in this action.

(e)     Punitive damages in an amount determined by the jury

(f)     Such other benefits as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff, Dr. Rosen, demands trial by jury on all issues so triable.

Respectfully submitted this the 14th day of May, 2014.


s/ G. Daniel Evans

G. Daniel Evans
ASB-1661-N76G
Attorney for the Plaintiffs
The Evans Law Firm, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209
Telephone:  (205) 870-1970
Fax: (205) 870-7763
E-Mail: gdevans@evanslawpc.com

/s Alexandria Parrish
Alexandria Parrish
ASB-2477-D66P
Attorney for the Plaintiffs
The Evans Law Firm, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209
Telephone:  (205) 870-1970
Fax: (205) 870-7763
E-Mail: ap@evanslawpc.com


Plaintiff's address:

c/o The Evans Law Firm, P.C.

Defendant's address:

UNUM Provident Corporation a/k/a The UNUM Group
c/o CSC LAWYERS INCORPORATING SRV INC
150 SOUTH PERRY ST
MONTGOMERY, AL 36104          **PLEASE SERVE BY CERTIFIED MAIL**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

LAWRENCE ROSEN, M.D.,

     PLAINTIFF,

vs.                        CIVIL ACTION NO: _____

UNUM PROVIDENT CORPORATION
a/k/a THE UNUM GROUP,

     DEFENDANT.

## REQUEST FOR SERVICE BY
## CERTIFIED MAIL

Please serve the defendant:

**UNUM Provident Corporation a/k/a The UNUM Group
c/o CSC LAWYERS INCORPORATING SRV INC
150 SOUTH PERRY ST
MONTGOMERY, AL 36104**

by certified mail pursuant to Alabama Rules of Civil Procedure 4(i)(2) and Federal Rules of Civil Procedure 4(e)(1).

*Alexandria Parrish*

Alexandria Parrish
ASB-2477-D66P
Attorney for the Plaintiffs
The Evans Law Firm, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209
Telephone:  (205) 870-1970
Fax: (205) 870-7763
E-Mail: ap@evanslawpc.com