FILED
2015 Jan-21  PM 04:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

LAWRENCE ROSEN, M.D.,          }
                               }
     Plaintiff,                }
                               }        CIVIL ACTION NO.
v.                             }        2:14-cv-0922-WMA
                               }
PROVIDENT LIFE AND ACCIDENT    }
INSURANCE COMPANY,             }
                               }
     Defendant.                }


**MEMORANDUM OPINION**

The second amended complaint filed by Dr. Lawrence Rosen ("Rosen" or "plaintiff") against Provident Life and Accident Insurance Company ("Provident" or "defendant"), contains five counts or theories of liability. Count One, relying only upon Alabama law, alleges breach by Provident of a contract of disability insurance that, accordingly to Rosen, entitles him to substantial benefits until he reaches the age of 65. Count Two invokes 18 U.S.C. § 1962(a), claiming that Rosen suffered a "racketeering injury" arising out of Provident's alleged violation of the above-cited provision of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Count Three claims a different RICO violation, this time invoking 18 U.S.C. 1962(b). It alleges a "racketeering injury" that flowed from the use of Provident's investment of racketeering income. Count Four is a claim under Alabama law for fraud in the forms of misrepresentations by agents of Provident during the negotiations for Rosen's purchase of the

coverage, misstating it, and non-disclosure of facts that Provident was obligated to disclose.  Count Five is an Alabama law claim for bad faith refusal to pay the benefits to which Rosen claims he is entitled.

Contemporaneously with filing an answer, Provident filed two purportedly partially dispositive motions.  The first, filed with the answer on September 26, 2014, pursuant to Federal Rule of Civil Procedure 56, seeks a partial summary judgment dismissing all of Rosen's claims brought under Alabama law.  It avers that the non-RICO claims are preempted by the Employee Retirement Income Security Act ("ERISA").  Filed on October 27, 2014, the second motion invokes Federal Rule of Civil Procedure 12(c) and seeks "judgment on the pleadings", but it tracks the language of Rule 12(b)(6) by asserting that Counts Two, Three, Four, and Five each fails to state a claim upon which relief can be granted.  The only explanation for Provident's not invoking Rule 12(b)(6) and instead invoking Rule 12(c) is that a motion under Rule 12(b)(6) must be filed before an answer is filed.  Rosen makes no point about the possible inappropriateness of a Rule 12(c) motion as a belated substitute for a Rule 12(b)(6) motion, so the court will treat the Rule 12(c) motion just as it would a Rule 12(b)(6) motion.

It appears, then, that Provident initially defends with two affirmative propositions, one aimed at all state law claims (except the state claim for breach of an insurance contract, which cannot

2

be dismissed with prejudice if preempted by ERISA, because it could be restated as an ERISA claim). The second asserted absolute defense is that all counts, including the two RICO counts, fail to state claims upon which relief can be granted.

If the court should grant Provident's motion for partial summary judgment under Rule 56 based on ERISA preemption, its motion under Rule 12(c), as to the non-RICO claims, would be moot. Therefore, the court must first address Provident's Rule 56 motion for ERISA preemption.

### Pertinent Facts on the ERISA Preemption Question

As it must, the court gives non-movant, Rosen, the benefit of the doubt as to all of the pertinent facts reflected in the evidence before the court, no matter by which party submitted. It also gives Rosen the benefit of all logical inferences from that evidence. If there is a dispute as to a material fact, Rosen's version of that fact will be assumed to be correct for Rule 56 purposes.

Provident has accompanied its Rule 56 motion with substantial evidentiary material. In its submission, it outlines the following evidence that it says is undisputed and that entitles it to a determination, as a matter of law, that Rosen's claims (except his RICO claims) are preempted by, and thus governed by, ERISA:

1. On or about April 10, 1990, Dr. Rosen's employer, Northeast Alabama Urology Center, P.C. ("NEAUC"), entered into a Salary Allotment Agreement with Provident Life agreeing with respect to policies issued by Provident Life "[t]o pay in full the required premiums

3

for such policies and to remit such premiums to the insurance company when due." (Declaration of Roxanne Kaminski, Exhibit 1, ¶¶ 5-6, and Ex. A thereto).

2.   In consideration of NEAUC's agreement, Provident Life agreed "[t]o accept premiums for such policies in accordance with published rates for policies where premiums are so deducted and so remitted." (*Id.*, ¶¶ 5-6, and Ex. A thereto).

3.   In return for NEAUC's entering into the Salary Allotment Agreement, NEAUC's employees could apply for and obtain individual disability insurance policies with a 12% premium discount based on NEAUC's commitment to pay the premiums for all employed participants (*Id.*, ¶ 5).

4.   To obtain the 12% premium discount, three or more employees at NEAUC had to participate in the salary allotment program. (*Id.*, ¶ 7).

5.   Five applications were submitted from NEAUC employees. (*Id.*)

6.   In conjunction with the execution of the Salary Allotment Agreement, and the receipt of the applications from five employees of NEAUC, Provident Life assigned "Risk Number" 77866 to NEAUC.

7.   In May, 1990, Provident Life issued and delivered five policies to employees at NEAUC including Dr. Rosen. (*Id.*, ¶ 7, and Exs. B and C thereto).

8.   The policies were issued with a 12% premium for all participating employees, and this discount was only available to individuals who were employees of the employer entering into the Salary Allotment Agreement. (*Id.*, ¶ 8).

9.   A number of other employees of NEAUC applied for and received individual disability policies from Provident Life after 1990 and received a 12% premium discount because NEAUC entered into the Salary Allotment Agreement and agreed to its terms. (*Id.* ¶ 9).

10.   Each of the policies issued under the Salary Allotment Agreement, including Dr. Rosen's, contained a salary allotment rider referencing the Salary Allotment Agreement with NEAUC as the employer. (*Id.*, ¶ 10, and Ex. D thereto).

11.   Provident Life also applies financial underwriting to the applications for disability coverage in which it follows guidelines to make sure that the applicant does not obtain more coverage than is allowed based on current income.  If the premiums are paid by the employer with no portion of the premium included in the insured's taxable income, the employee can obtain a greater amount of coverage than he or she would be able

4

> to obtain if he or she paid the premiums or if the
> premiums were included in his or her taxable income.
> (*Id.*, ¶ 12).

12. Dr. Rosen applied for a Provident Life disability insurance policy. (*Id.*, ¶ 13, and Ex. F thereto).

13. On his application, Dr. Rosen responded "yes" to question 11(a), which asked: "Will your employer pay for all disability coverage to be carried by you with no portion of the premium to be included in your taxable income?" (*Id.*)

14. Based upon representations by Dr. Rosen in his application that the premiums would be paid by his employer with no portion allocated to his taxable income, Provident Life issued the policy to him for an amount above which he would have been permitted to obtain if premiums were paid by him or were charged to him as taxable income. (*Id.*, ¶ 14).

15. Dr. Rosen's policy has remained the same and has not been altered or converted since it was issued by Provident Life, and Dr. Rosen has continued to receive the benefit of the 12% premium discount he obtained based on his employer's agreement to enter into the Salary Allotment Agreement. (*Id.*, ¶ 16).

16. Premium statements for the policy issued to Dr. Rosen and the policies in effect have been billed under the risk group and sent directly to NEAUC up until the time of Dr. Rosen's claim. NEAUC paid those premiums directly to Provident Life. (*Id.*, ¶¶ 17-18, and Ex. G thereto).

These "facts" are lifted verbatim from Provident's submission. Many of them are offered as attachments to the declaration of Roxanne Kaminski, an employee of Provident, which is the subject of a motion to strike by Rosen.

Rosen counters, not only with his motion to strike the Kaminski declaration, which, if granted, might create disputes of material fact not otherwise detectable, but with the following rendition of the "facts" that he contends are undisputed and that demonstrate that his state law claims are not preempted by ERISA:

1. Dr. Rosen has been the sole owner of NEAUC since it was

5

formed in 1985.  (See Exhibit 1)

2.    At all times since its formation, Dr. Rosen has been the only doctor employed by NEAUC (See Exhibit 1)

3.    Since its inception in 1985, NEAUC has never had a group disability insurance plan or policy for its employees. (See Exhibits 1 & 2)

4.    NEAUC has never offered any welfare benefit plan of any kind to its employees.  In fact, the only employee benefit that NEAUC has ever had is a deferred compensation plan.  (See Exhibits 1 & 5)

5.    In the late 1980's early 1990's, Dr. Rosen's financial advisor, Mike Monroe, brought a Provident agent to Dr. Rosen's office to present the benefits of a Provident individual disability income policy.  (See Exhibits 1 & 2)

6.    At that time, Dr. Rosen already had disability insurance policies with UNUM, but the Provident agent who came with Mike Monroe explained that Dr. Rosen could get the same or better coverage for less money, so Dr. Rosen filled out an application for a Provident individual disability insurance ('IDI') policy and a business overhead expense ('BOE') policy.  (See Exhibits 1 & 2)

7.    Dr. Rosen was told by the agent that the Provident policies would provide the same monthly benefits as his then existing UNUM policies and that he would get those benefits if he was unable to perform the material and substantial duties of his specialty as urologic surgeon. (See Exhibits 1 & 2)

8.    Dr. Rosen had an existing individual disability policy in force with UNUM that provided $19,300 in monthly benefits if he became totally disabled, and a BOE policy which provided $12,000 in monthly benefits in the event he became totally disabled.  (See Exhibit 3, pg. 20 Question 4, (Bates PLA-POL-IDI(7028896)-000020)

9.    Dr. Rosen did not financially qualify for a $19,300/monthly benefit with Provident, but Provident issued him a policy for that benefit amount on an "exception" basis.  (See Exhibit 6, pg.2)

10.   Provident offered Dr. Rosen an Individual Disability Policy and a Business Overhead Policy with the same benefits he had under his UNUM policies, so Dr. Rosen accepted Provident's offer and cancelled his UNUM policies (See Exhibits 1,2,3)

11.   At some point Dr. Rosen was told that he needed to pay the premiums through his company NEAUC which he did. (See Exhibits 1 & 2)

12.   The Provident agent never discussed anything about a welfare benefit plan or ERISA throughout the sales and

6

issuance process.  (See Exhibits 1 & 2)

13.  Dr. Rosen's accountant explained to him the tax implications of how the policy premiums were paid years later.  (See Exhibits 1 & 2)

14.  Dr. Rosen's company, NEAUC, never created a welfare benefit plan for its employees nor did it endorse or promote a specific insurance company to its employees. (See Exhibits 1 & 2)

15.  Several employees of NEAUC decided to apply for and purchase individual disability income policies from Provident around the same time Dr. Rosen replaced his UNUM policies (1990).  (See Exhibits 1 & 2)

16.  The employees of NEAUC who purchased insurance with Provident in the early 1990's did so under a policy form different from Dr. Rosen's. (Exhibit 2, Doc. 15-1, page 25)

17.  While NEAUC did not have copies of the employee's policies and NEAUC was not involved in issuing the policies, NEAUC paid the Provident bill each quarter and then deducted the entire premium payments from each employee's after tax income.  NEAUC did not contribute anything to the funding of any of the Provident policies.  (See Exhibits 1 & 5)

18.  From 1990-1994 there were five (5) policies in addition to Dr. Rosen's, but the number of policies decreased every year.  Since 1995, the only policies that have been paid on the Provident bill have been Dr. Rosen's. (See Exhibits 1 & 5)

19.  NEAUC was not involved with promoting or marketing the individual disability policies Provident sold employees of NEAUC.  (See Exhibits 1 & 2)

20.  Each employee made an individual decision on what insurance policies they wanted to apply for and purchase and how long they wanted to keep the policy.  Each employee also decided what they wanted to do with the policy once they left employment with NEAUC.  The employees, like Dr. Rosen, also paid the entire premiums for their policies as deductions from their salaries. (See Exhibits 1,2 & 5)

21.  Dr. Rosen's disability premiums were paid by him after being deducted from his salary and, he states in his application for the policy, no portion of the premium was included as taxable income to him.  (See Exhibits 1 & 5, Doc 15-1 page 23)

22.  NEAUC has never filed a form 5500 for a disability plan or a welfare benefit plan.  (See Exhibits 1 & 5)

23.  As owner of NEAUC, Dr. Rosen never intended to create a disability benefit plan and he has never considered

NEAUC to have a disability plan.  (See Exhibit 1)

24.   Prior to his disability, Dr Rosen was never told by Provident that it considered his individual disability policies to be part of an ERISA plan.  (See Exhibit 1)

25.   If Dr. Rosen had been told that the Provident policies would lead to the establishment of an ERISA plan, he would not have agreed to purchase the policies.  (See Exhibit 1)

26.   Provident has never mentioned ERISA to Dr. Rosen throughout the three years it has been managing his claim.  (See Exhibit 1)

27.   Provident has never issued Dr. Rosen a Form 1099 for the disability benefits it has paid him over the years nor did it issue him a 1099 for the refunded premium it sent him.  (Exhibits 1 & 2)

28.   Dr. Rosen's policies themselves do not mention ERISA and Provident never sent him forms or communications referencing ERISA until he filed this lawsuit to recover total disability benefits due under his policies.  (See Exhibit 1)

29.   Dr. Rosen's policy did not include the 1813 ERISA form that Provident sent multilife policyholders for policies that were issued through an ERISA welfare benefit plan.  (See Exhibits 3 & 4 - page 1)

30.   Dr. Rosen's Individual Disability Policy contains contract language that specifically references compliance with State laws.  This type of language is inconsistent with ERISA preemption and not found in group policies for which ERISA applies.  (See Exhibits 3 at pg 15 (PLA-POL-ID(7028896)-000018) & 4 at pg 12 (PLA-POL-BOE(7028897)-000021)

31.   Other than paying the quarterly premiums and then deducting those from Dr. Rosen's after tax income NEAUC has had no participation in his Provident disability policies.  (See Exhibits 1 & 2)

32.   NEAUC does not have copies of Dr. Rosen's disability policies.  (See Exhibit 1)

33.   Additionally, NEAUC does not interact with Dr. Rosen's financial advisor, Mike Monroe, or Provident regarding benefits payable through Dr. Rosen's individual disability policies.  NEAUC does not have any welfare benefit plan documents or summary plan descriptions relating to Dr. Rosen's disability policies.  (See Exhibits 1 & 5)

34.   Provident's underwriting guidelines issued December 9, 1988 show that Dr. Rosen's policy was not part of group policy because when Provident does group policies it requires a "traditional plan with a minimum of 10

8

employees."  (Doc. 15-1 pg. 17)

35.    Provident gave Dr. Rosen a 2% discount for also buying
       a BOE policy from them and then an additional 10% Large
       Case discount.  (Doc. 15-1 pg. 18)

36.    Dr. Rosen's policy was issued "in consideration of the
       payment in advance of the required premium."  (Doc 14-1
       pg 15)

37.    Dr. Rosen's policy does not mention any discounts Dr.
       Rosen received for purchasing his personal disability
       policies.  Provident used discount pricing in "buying
       premium" as a "formidable challenge to the competition."
       (Doc. 15-1 pg. 17)

38.    The salary allotment agreement referenced by Provident
       is terminable and its termination does not affect the
       continuation of coverage nor the premiums due. (Exhibit
       3, pg. 16)

Because the court can glean from the totality of this
evidence, without striking any of it submitted under Kaminski's
imprimatur, that Provident's Rule 56 motion should be denied, the
court will deny Rosen's motion to strike the Kaminski declaration.
Although Rosen's motion to strike has merit in certain respects, an
opinion by this court trying to distinguish between the evidence
that depends upon the admissibility of Kaminski's declaration, and
that which does not, would take more of this court's judicial
effort than the court is willing to expend.  Furthermore, Rosen
himself relies upon some of the evidence identified by Kaminski,
and Rosen cannot have it both ways.

The court well understands why Provident wants to place the
ERISA fence around Rosen's state law claims.  It would be well
worth the effort if Provident could meet its burden of proving that
ERISA affords Rosen his only remedy, that is, outside of RICO.

Provident does not deny that it never mentioned ERISA to Rosen until Rosen had gone to court without first attempting to exhaust the administrative remedies mandated by ERISA.  If super-duper-preemption forces Rosen to pursue the limited ERISA remedy, the first defense Provident would likely interpose is his failure to exhaust.  He has already pretty much exhausted himself, if his complaint can be believed.

With nothing in the record called a "plan", or a "sponsor", or a "plan administrator", or a "claims administrator", Provident is necessarily arguing that Rosen was required on his own to figure out that he was covered for disability, if at all, by an employee ERISA benefit plan, and that he should have proceeded to seek any benefits to which he is entitled under the ERISA scheme.  This is a tall order.  If he had started such a process by asking for a copy of the summary plan description, there was none to give him.

This court long ago authored a string of cases in which it held that no ERISA plan existed under circumstances not dissimilar from these, or that the "plan" was entitled to the "safe harbor" exemption. *See Jordan v. Reliable Life Ins. Co.*, 694 F.Supp. 822 (N.D.Ala.1988); *Wright v. Sterling Investors Life Ins. Co.*, 747 F.Supp. 653 (N.D.Ala.1990); *Bryant v. Blue Cross and Blue Shield*, 751 F.Supp. 968 (N.D.Ala.1990); *Mitchell v. Investors Guar. Life Ins. Co.*, 868 F.Supp. 1344 (N.D.Ala.1994); *Hensley v. Philadelphia Life Ins. Co.*, 878 F.Supp. 1465 (N.D.Ala.1995); and *Gray v. New*

10

*York Life Ins. Co.*, 879 F.Supp. 99 (N.D.Ala.1995).  In many of these cases the employer who was alleged to have created an ERISA plan was, like NEAUC in this case, a mere conduit for collecting and paying the premiums to the insurer. In *Jordan v. Reliable*, this court, in finding that the insurance policy there in question was not governed by ERISA, held:

> . . . Reliable has not produced the written instrument required by 29 U.S.C. § 1102 for the creation of an "employee benefit plan."  It is impossible to tell from the record in this case whether or not the subject insurance policy is even a part of an "employee welfare benefit plan," particularly when the "Accident Insurance Plan for Salaried Employees" attached to the complaint does not contain the requisites set out in 29 U.S.C. § 1102.  For instance, the document does not "provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan."  For instance, the document does not "provide a procedure for establishing and carrying out a funding policy and method consistent with the objectives of the plan."  For instance, the document does not "describe any procedure under the plan for the allocation of responsibilities for the operation and administration of the plan."  For instance, the document does not "provide a procedure for amending such plan and for identifying the persons who have authority to amend the plan."  For instance, the document does not "specify the basis on which payments are to be made to and from the plan."  The document only constitutes the usual and customary form of a group policy of accident insurance.

694 F.Supp. at 833-34.

In ERISA, Congress defined an "employee welfare benefit plan" to include:

> . . . any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for

11

the purpose of providing for its participants or their
beneficiaries, through the purchase of insurance or otherwise
. . . benefits in the event of sickness, accident, disability,
death or unemployment . . . .

29 U.S.C. § 1002(1).

While this language outlines five[1] essential elements for
establishing an "employee welfare benefit plan," the substance of
these elements is hard to grasp or to articulate. In particular,
"ERISA's definitions of 'employee,' and, in turn, 'participant,'
are uninformative[,] . . . 'completely circular and explain[]
nothing.'" *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v.
Hendon*, 541 U.S. 1, 12 (2004) (quoting *Nationwide Mut. Ins. Co. v.
Darden*, 503 U.S. 318, 323 (1992)).

    In an attempt to clarify these ambiguities, Congress
specifically conferred discretion upon the Secretary of Labor to
"prescribe such regulations as he finds necessary or appropriate to
carry out the provisions of [Title I of ERISA]." 29 U.S.C. § 1135.
Clear and reasonable regulations issued pursuant to this authority
are entitled to deference by the courts. *Massachusetts v. Morash*,

---

[1] Courts have generally distilled this language into five
requirements:

> (1) a "plan, fund, or program" (2) established or maintained
> (3) by an employer or by an employee organization, or by
> both, (4) for the purpose of providing medical, surgical,
> hospital care, sickness, accident, disability, death,
> unemployment or vacation benefits, apprenticeship or other
> training programs, day care centers, scholarship funds,
> prepaid legal services or severance benefits (5) to
> participants or their beneficiaries.

*Donovan v. Dillingham*, 688 F.2d 1367, 1371 (11th Cir. 1982).

490 U.S. 107, 116 (1989) (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984)).

**Was This Arrangement an Employee Welfare Benefit Plan?**

Generally speaking, to demonstrate the existence of an ERISA plan requires that the five requirements outlined in *Donovan v. Dillingham*, 688 F.2d 1367 (11th Cir. 1982), be satisfied. However, the undersigned, along with the Eleventh Circuit, has emphasized that "not **all** welfare benefit plans that meet these five criteria are governed by ERISA . . . plans, funds or programs under which . . . no employees or former employees participate are not employee welfare benefit plans under Title I of ERISA." *McLain v. Unum Life Ins. Co. Of America*, 2013 WL 3242842 * 3 (June 21, 2013) (quoting *Slamen v. Paul Revere Life Ins. Co.* 166 F.3d 1102, 1104 (11th Cir. 1999))(emphasis added). The Department of Labor has defined an "employee benefit plan" to exclude "any plan, fund or program . . . under which no employees are participants covered under the plan." 29 C.F.R. § 2510.3-3. Quite plainly, "if a benefit plan covers **only working owners**, it is not covered by Title I." *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 22, n.6 (2004). (emphasis added). "Plans covering working owners ***and their nonowner employees***, on the other hand, fall entirely within ERISA's compass." *Raymond B. Yates,* at 21 (2004). (emphasis added).

"[T]o establish that the plan in this case [*Slamen*] is governed by ERISA, [the insurance company] would have to show that

an employee other than [the sole owner physician] received benefits under the disability insurance policy." *Slamen v. Paul Revere Life Ins. Co.* 166 F.3d 1102, 1106, n.4 (11th Cir. 1999). Courts ought not "ignore[] the fact that [] plans, however similar, are two separate plans [where] [t]he plan covering the partners does not pay any benefit to [employees], and the plan covering [employees] does not pay any benefit to partners." *Slamen* at 1105 (quoting *Robertson v. Alexander Grant & Co.*, 798 F.2d 868, 871-72 (5th Cir. 1986)).

In *Slamen*, the "two policies were purchased at **different** times, from **different** insurers, and for **different** purposes." *Slamen* at 1105 (cited approvingly in *Raymond B. Yates,* 541 U.S. 1, 22, n.6 (2004) (emphasis added). Here, the disability insurance policies covering Rosen were purchased at the **same** time, from the **same** insurer, and for the **same** purposes. Yet, relying on the Department of Labor's regulation, the Eleventh Circuit in *Slamen* found dispositive the fact that "Slamen's disability insurance policy covered only himself." *Slamen* at 1105. This distinction is consistent with the purpose of excluding from the reach of ERISA benefit policies that provide benefits only to **employers** because "[w]hen the employee and employer are one and the same, there is little need to regulate plan administration." *Slamen* at 1105-06.

Other circuits which have faced this problem have followed the Eleventh Circuit's *Donovan v. Dillingham* and have similarly applied

the *Slamen* distinction. In *House v. American United Life Ins. Co.*, the Fifth Circuit determined that a multi-class group insurance policy constituted a single "employee welfare benefit program" because owners and employees "benefitted from the unitary rate structure the firm was able to negotiate bargaining for the disability coverage as a package, effectively receiving a constructive contribution from the firm." 499 F.3d 443 at 452 (5th Cir. 2007). This holding accords with the example provided by the Department of Labor in 29 C.F.R. § 2510.3-3(b), which states:

> For example, a so-called "Keogh" or "H.R. 10" plan under which only partners or only a sole proprietor are participants covered under the plan will not be covered under Title I. However, a Keogh plan under which one or more common law employees, in addition to the self-employed individuals, are participants covered under the plan, will be covered under Title I.

Given the structure of a Keogh plan, inclusion of a common law employee under the plan would result in benefits to other partners or the sole proprietor. *Robertson v. Alexander Grant & Co.*, 798 F.2d 868, 871 (5th Cir. 1986). Even where plans "are nearly identical," the plans constitute separate plans if "[t]he plan covering the partners does not pay any benefits to [employees], and the plan covering [employees] does not pay any benefits to partners." *Robertson* at 871-72. Likewise, in *LaVenture v. Prudential Ins. Co. Of America*, the Ninth Circuit agreed with the distinction outlined in *Slamen* and concluded that "LaVenture's disability insurance is not an ERISA plan because all of the

15

benefits flow to the owner." 237 F.3d 1042, 1047 (9th Cir. 2001). See *Zeiger v. Zeiger*, 131 F.3d 150 (9th Cir. 1997) ("A non-ERISA plan is not converted into an ERISA plan merely because the employer also sponsors a separate benefits plan subject to ERISA."). Being rooted in the text of the regulation,[2] this distinction is entitled to deference. *Massachusetts v. Morash*, 490 U.S. 107, 116 (1989).

Provident itself has been the subject of many court decisions involving ERISA. One of them clearly applies to the instant case. It is *Schwartz v. Provident Life*, 28 F.Supp.2d 837 (D. Ariz. 2003) in which Provident failed to convince the court that an employer who did not endorse the insurance policies in question, and who was only a conduit for the payment of premiums, had not created an ERISA plan.

In the instant case the parties agree that Rosen was insured under individually underwritten form 337 and 1737 disability policies and that other NEAUC employees were insured under

---

[2] Accordance of the *Slamen* distinction with the text of the regulation is further supported by the Department of Labor's own interpretation of the regulation. See DOL Advisory Opinion 76-67, 1976 WL 5082 (May 21, 1976) at *1 ("plans need not comply with any of the reporting requirements of the Employee Retirement Income Security Act of 1974 (ERISA) . . . where the stock of the corporation is wholly owned by one shareholder and his or her spouse and the shareholder or the shareholder and his or her spouse are the only participants in the plan."). This interpretation is also entitled to substantial deference. See *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S.Ct. 1325, 1335-36 (2011) and *Barnhart v. Walton*, 535 U.S. 212, 221-22 (2002).

individually underwritten form 297N disability policies. (Doc. 14-1 ¶¶ 7-13; Doc. 15-1 at 25-29; Doc. 33 at 13; Doc 37 at 6-7). Nowhere does Provident show that any employee of NEAUC, other than Rosen, was insured under a form 337 or a form 1737 policy. Provident also fails to show that any employee other than Rosen could receive benefits under the form 337 and 1737 policies or that Rosen received any benefits from the other employees' form 297N policies. Rather, based on the affidavit of Kaminski, Provident's own employee, and the publication explaining the form 337 policy, only Rosen was eligible to receive any benefits under his disability policies. (Doc. 14-1) Further, Provident remarkably provides no explanation for the form 297N policies it alleges to be part of an NEAUC employee welfare benefit plan.

Although Provident asserts that the various policies were issued under the same risk number, #0077866, Provident provides no reason to give significance to this common risk number while conceding that the policies were individually underwritten. (Doc. 37 at 6, 10). In fact, Provident attaches to its evidentiary submissions Rosen's application for coverage in which he specifically indicated that he was applying for "(1) Individual" and "(5) Overhead Expense" disability coverage but not "(2) Association, (3) Group, or (4) Employer Sick Pay" disability coverage. (Doc. 15-1 at 23). Provident also points to the fact that the policies shared a common salary allotment agreement. However,

Provident provides no reason to give significance to such an agreement beyond the reference to an alleged "12% premium discount" (Doc. 13 at 2), and omits any reference to the salary allotment riders for the employees insured under the form 297N policies. Provident provides no basis for the "12% premium discount" beyond the affidavit of its own employee (who fails to point to any terms in the policy or other documentation supporting a basis for the discount). (Doc. 14-1). Instead, Provident provides a discount sheet contradicting its own employee's assertion by indicating a 2% discount where "[a]n insured has a 337 an[d] a BOE policy . . ." and a 10% "Large Case Discount" that is "[a]pplicable to Form 337 only" and where "[o]nly Form 337 premiums are counted towards qualification [for the discount]." (Doc. 15-1 at 17-18). On the basis of these facts provided by Provident itself, ERISA preemption is entirely inappropriate.  Because Provident drafted all of the documents, any ambiguity must be resolved against it.

Beyond Provident's own pleadings and attachments, Rosen, if not himself entitled to partial summary judgment on the preemption issue, demonstrates genuine issues as to the material fact of whether the form 337, 1737 and 297N policies constitute a single "employee welfare benefit plan." Neither of Rosen's policies included the "1813 ERISA information sheet sent with multilife issued policies." (Doc. 32-3 at 1; Doc. 32-4 at 1). Further, Rosen provides an affidavit from his insurance broker for the various

policies purchased in 1990. The broker maintains that he "had an individual relationship with each [NEAUC] employee and did not share that client information with Dr. Rosen or the Clinic." (Doc. 32-2 at 3). The broker says that "the Provident disability policies were not group policies, the policies had an own occupation definition of disability, that they were individually underwritten and were portable." (Doc. 32-2 at 2). Specifically, the broker recalls selling the disability policies to NEAUC employees where Provident applied a 30% special class assessment to one NEAUC employee, and Provident denied coverage to another NEAUC employee due to height/weight issues. (Doc. 32-2 at 3). These facts are incompatible with Provident's characterization of the policies as part of an "employee welfare benefit program" and instead strongly suggest that the policies were separate and individual disability policies outside the embrace of ERISA. The decisions to buy policies were voluntary, and the policies were not touted by the employer.

Because there are at least genuine issues of material fact as to whether the coverages under the form 337, 1737 and 297N policies constitutes an "employee welfare benefit program", Provident's Rule 56 motion must be denied. The court does not see how Provident can prove any set of facts that would turn Rosen's policies into part of an ERISA benefits package.

**ERISA Safe-Harbor**

Even if the policies under forms 337, 1737, and 297N could be grouped into a single "employee welfare benefit plan", which they cannot, such a plan would fall within the Department of Labor's "safe harbor" provision. 29 C.F.R. § 25210.3-1(j). The said regulation provides:

> For purposes of title I of the Act and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which (1) No contributions are made by an employer or employee organization; (2) Participation the program is completely voluntary for employees or members; (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or checkoffs.

To fall within this safe harbor, a plan must satisfy each of the requirements set forth in § 25210.3-1(j). *Randol v. Mid-W. Nat. Life Ins. Co. of Tennessee*, 987 F.2d 1547, 1550 (11th Cir. 1993).

In order to fulfill the first safe harbor requirement, Rosen points out that although NEAUC remitted the premiums, it deducted them from the salaries of the insured employees. (Doc. 32-1 at 2-3; 33 at 19). Provident relies on Rosen's application, in which he checked "yes" to the question "[w]ill employer pay for all

disability coverage to be carried by you with no portion of the premium to be included in your taxable income?" (Doc. 15-1 at 23; Doc. 32-2 at 20). "In analyzing this element, courts must consider the behavior of the parties at the time of the payment, not later, self-serving allegations." *Cowart v. Metro. Life Ins. Co.*, 444 F. Supp. 2d 1282, 1290 (M.D. Ga. 2006). Rosen contends, without contradiction, that the premiums were deducted from his salary. While Provident argues that Rosen's signed application reflects a different contractual arrangement, Provident does not challenge or present evidence to prove behavior inconsistent with NEAUC's being a mere conduit. (Doc. 32-1 at 2-3). Construing the facts and the language in the light most favorable to Rosen, summary judgment is inappropriate on the basis of the very first safe harbor requirement. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Further, under the first, third, and fourth safe harbor requirements, Provident's application of a "12% premium discount" does not place the plan outside the safe harbor definition. First, the parties disagree over whether the "12% premium discount" Rosen received was due to the salary allotment agreement or was simply in accordance with other discounts available under form 337 and 1737 policies. (Doc. 15-1 at 17-19). Yet, even if the "12% premium discount" arose from the salary allotment agreement, such a discount is not an "employer contribution." Some courts have determined that a premium discount constitutes a contribution

21

because it is a benefit an employee cannot receive as an individual. However, this construction is contrary to the text of the regulation and would swallow the third and fourth safe harbor requirements. *Contra, Stone v. Disability Management Servs., Inc.*, 288 F.Supp.2d 684, 692 (M.D.Pa.2003); *Brown v. Paul Revere Life Ins. Co.*, No. CIV.A. 01-1931, 2002 WL 1019021, at *7 (E.D. Pa. May 20, 2002). The third safe harbor requirement expressly allows an employer to remit payment to an insurer through payroll deductions, and the fourth safe harbor requirement allows reasonable compensation to the employer for its discharge of the burden of providing payment via payroll deductions. 29 C.F.R. § 25210.3-1(j). Categorizing a "12% premium discount" for payroll deductions to be an "employer contribution" would severely limit the scope of the third requirement and effectively eliminate the fourth requirement. The Department of Labor's specific safe harboring of plans that provide payroll deductions and reasonable compensation for the administrative burden of such deductions is entitled to deference by this court. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984). Further, the weight of authority advises in favor of this construction. See *Letner v. Unum Life Ins. Co. of Am.*, 203 F. Supp. 2d 1291, 1300-01 (N.D. Fla. 2001).

Even if the various disability policies at issue here could be proven to constitute an "employee welfare benefit plan," summary

judgment is inappropriate because when construed in the light most favorable to Rosen, the alleged "plan" falls within the safe harbor provision established by the Department of Labor.

### Does Each of the Five Counts State a Claim Upon Which the Requested Relief Can be Granted?

"Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### Bad Faith and Fraud Claims

As its alleged absolute defense to the Alabama law claims of bad faith and fraud, if not preempted by ERISA, Provident relies upon the bar of a two-year statute of limitations. Under Alabama law, "bad faith refusal to pay a claim is merely a species of fraud and, as such, the statute of limitation applicable to fraud appl[ies]." *Dumas v. S. Guar. Ins. Co.*, 408 So. 2d 86, 89 (Ala. 1981). Therefore, the applicable statute of limitations for both fraud and bad faith claims is two years. Ala. Code § 6-2-38; *Jones v. Alfa Mut. Ins. Co.*, 1 So. 3d 23, 30 (Ala. 2008).

"The very basic and long settled rule of construction of [Alabama] courts is that a statute of limitations begins to run . . . as soon as the party in whose favor it arises is entitled to maintain an action thereon." *Wheeler v. George*, 39 So. 3d 1061, 1084 (Ala. 2009)(italics omitted). By statute, a claim of fraud is

23

not "considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud." Ala. Code § 6-2-3. Specifically, Alabama courts have interpreted this accrual to be "when the party seeking to bring the action knew of facts which would put a reasonable mind on notice of the possible existence of [fraud and bad faith]." *ALFA Mut. Ins. Co. v. Smith*, 540 So. 2d 691, 693 (Ala. 1988) (italics omitted); *Farmers & Merchants Bank v. Home Ins. Co.*, 514 So. 2d 825, 831 (Ala. 1987). Generally, accrual for said claims "is a question of fact to be determined by the circumstances of each case." *Jones v. Alfa Mut. Ins. Co.*, 1 So. 3d 23, 30 (Ala. 2008)(quotation omitted). "The question of when a plaintiff should have discovered fraud should be taken away from the jury and decided as a matter of law **only** in cases in which the plaintiff *actually knew* of facts that would have put a reasonable person on notice of fraud." *Bryant Bank v. Talmage Kirkland & Co.*, 2011 WL 11742121, at *6 (Ala. May 23, 2014)(emphasis added).

Provident argues that the statute of limitations began to run when it notified Rosen by letter on December 19, 2011, that he did not qualify for benefits under the "total disability" provision of the policy. (Doc. 24 at 13). While Rosen's claim for breach of contract may have arisen upon his receipt of the said letter, mere denial of benefits does not automatically give rise to a claim of fraud or bad faith by the insurer. *Tyson v. Safeco Ins. Companies*,

24

461 So. 2d 1308, 1311 (Ala. 1984).   There is, of course,  no statute of limitations defense to the contract claim.

Rosen's fraud and bad faith claims arguably arose at some point during Provident's **repeated** refusals to pay benefits despite Rosen's continued documented submissions to Provident up through the date of the filing this action, updating Provident on Rosen's ongoing disability diagnosis and declining revenue. (Doc. 19, ¶¶ 170-72). Provident admits in its answer that it has continued to receive these documentary submissions from Rosen (Doc. 23, ¶¶ 170-71) and further admits that even now it continues to "to evaluate Dr. Rosen's ongoing claim pursuant to the disability policy." (Doc. 23, ¶ 60).

For purposes of Provident's Rule 12(c) motion, this court need not determine the exact date upon when the fraud and bad faith causes of action arose, but rather only that an issue of material fact exists as to whether and when a reasonable mind could be on notice of the possible existence of fraud and/or bad faith. In this case, when the allegations are construed in the light most favorable to Rosen, both his claim of fraud and his claim of bad faith can fall within the two year statutory period and therefore are not barred by the statute. The burden of proving the affirmative defense of statute of limitations at trial will be on Provident.

**The RICO Claims**

"To prove any RICO violation, a plaintiff must prove the existence of a 'pattern of racketeering activity.'" *Beck v. Prupis*, 162 F.3d 1090, 1095 (11th Cir. 1998) aff'd, 529 U.S. 494 (2000) (quoting 18 U.S.C. § 1962). A pattern of racketeering activity requires that plaintiff allege "two or more predicate acts within a ten-year time span" from those listed in the organic statute. 18 U.S.C. § 1961; *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1264 (11th Cir. 2004).

In Rosen's second amended complaint, he specifically alleges three of the predicate acts listed in the RICO statute: mail fraud, interference with commerce, and racketeering. (Doc. 19, ¶ 101, 130-33, 138-40). While a mere conclusory listing of predicate acts has been found by some district courts to be insufficient, Rosen goes beyond the mere labels in 18 U.S.C. § 1691, and substantively pleads each predicate act by describing it. *Brick v. Unum Life Ins. Co. of Am.*, 2005 WL 5950106, at *4 (M.D. Fla. Oct. 13, 2005). First, Rosen says that Provident, through use of the mails, conducted its scheme of denying multitudinous long term disability claims (Doc. 19, ¶ 132, 139). Provident itself admits that it sent letters to Rosen involving his claims on August 1, 2011 (Doc. 23, ¶ 28), October 13, 2011 (Doc. 23, ¶¶ 30-31), November 7, 2011 (Doc. 23, ¶ 33), and December 19, 2011 (Doc. 23, ¶¶ 36-38). Rosen next alleges that Provident's scheme interfered with commerce, given

Provident's interstate disbursements and involvement in markets throughout the country. (Doc. 19, ¶ 131). While Provident disputes the existence of a RICO scheme, it admits that it conducts business in forty-seven states and two other jurisdictions. (Doc. 23, ¶ 24). Finally, Rosen alleges that Provident engaged in racketeering activity and describes in extensive detail its *modus operandi*. (Doc. 19, ¶ 101, 130, 132, 133, 138-40).

Given that the facts of these three alleged predicate acts are taken as true for purposes of a Rule 12(c) or 12(b)(6) motion, Rosen sufficiently pleads the "two or more" predicate acts required by 18 U.S.C. § 1691.

### 18 U.S.C. 1962(a)

"Section 1962(a) prohibits the investment of proceeds derived from a pattern of racketeering activity in any enterprise involving interstate commerce." *Beck v. Prupis*, 162 F.3d 1090, 1095, n. 8 (11th Cir. 1998) aff'd, 529 U.S. 494 (2000). The statute provides in relevant part:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

From this language, "most courts of appeals have adopted the so-called investment injury rule, which requires that a plaintiff suing for a violation of § 1962(a) allege injury from the

defendant's "use or invest[ment] of income derived from racketeering activity," distinct from any injuries caused by the predicate acts of racketeering. *Beck v. Prupis*, 529 U.S. 494, 506, n. 9 (2000) (expressing no opinion on the investment injury rule).[3] "[M]ere reinvestment of the racketeering proceeds into a business activity is not sufficient for § 1962(a)." *Lockheed Martin Corp. v. Boeing Co.*, 357 F. Supp. 2d 1350, 1371 (M.D. Fla. 2005).

Under the investment injury rule, Rosen sufficiently alleges an investment injury under § 1962(a) because, distinct from the alleged racketeering injury of denying legitimate disability claims (Doc. 19 ¶ 132), Rosen alleges that Provident's savings from racketeering enabled it to undercut competing disability insurers and to prevent Rosen from having a wider variety of insurer options, including insurers that would provide quality services and

---

[3] The Eleventh Circuit has not expressly adopted the investment injury rule, and several of its district courts have opted for a broader interpretation of § 1962(a) that encompasses reinvestment. *In re Managed Care Litig.*, 150 F. Supp. 2d 1330, 1351 (S.D. Fla. 2001); *Avirgan v. Hull*, 691 F. Supp. 1357, 1362-63 (S.D. Fla. 1988), aff'd, 932 F.2d 1572 (11th Cir. 1991). Further, this court recognizes Congress's admonition that RICO is to "be liberally construed to effectuate its remedial purposes." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985) (quoting RICO, Pub.L. No. 91-452, § 904(a), 84 Stat. at 947); *Ray v. Spirit Airlines, Inc.*, 767 F.3d 1220, 1227 (11th Cir. 2014). For purposes of this motion, however, the court analyzes the pleadings under the more narrow investment injury rule, the standard applied in both parties' briefing, because if an investment injury is properly pled, by implication it also satisfies the broader reading of § 1962(a). Further, Provident concedes plaintiff has sufficiently pled injury from reinvestment of the racketeering proceeds, a sufficient injury under the broader reading. (Doc. 24 at 6).

honor their policy obligations. (Doc. 19, ¶¶ 132-33). Rosen's alleged injury is not mere injury from reinvestment in Provident generally, but rather that Provident's specific investment of its savings cut out insurance competitors from the market and prevented them from offering benefit plans which would honor claim payouts. Rather than mere speculation, Rosen supports this investment injury by alleging in his second amended complaint that he did not seek additional disability insurance from another carrier because he reasonably relied on Provident's false representations that his timely and consistent premium payments entitled him to long term disability coverage. Furthermore, Exhibit B attached to Rosen's second amended complaint includes an internal Provident memorandum in which Provident admits that it was a leader in the disability insurance market and that "[m]any of the smaller competitors have chosen to exit the business and have either sold their block or have entered into either a joint marketing agreement or private label arrangements with the primary disability carriers." (Doc. 19 at 3). Because Rosen's injuries were arguably proximately caused by Provident's investment and market dominance, rather than directly caused by the racketeering scheme itself, Rosen has sufficiently pled the requisite investment injury for his claim under the more narrow reading of § 1962(a).

## 18 U.S.C. § 1962(b)

"Section 1962(b) prohibits acquisition through a pattern of

racketeering activity of any interest in an enterprise involving interstate commerce." *Beck v. Prupis*, 162 F.3d 1090, 1095, n. 8 (11th Cir. 1998) aff'd, 529 U.S. 494 (2000). The statute provides:

> It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

Similar to the "investment injury" required in § 1962(a), in order to recover damages under § 1962(b), a plaintiff must allege injury from acquisition or maintenance of the enterprise separate from the racketeering activity itself. *Richardson v. Cella*, 2013 WL 4525642, at *5 (E.D. La. Aug. 26, 2013); see *Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1230-31 (D.C. Cir. 1991) ("plaintiffs must allege an 'acquisition' injury, analogous to the 'use or investment injury' required under § 1962(a) to show injury by reason of a § 1962(b) violation").

In this case, beyond the injury from Provident's alleged scheme to deny payouts to Rosen and numerous other policyholders, Rosen alleges that by maintaining the enterprise, Provident's scheme undercut competitors, thus depriving him of competing disability insurers who would honor their contractual obligations. Beyond mere speculation, Rosen attaches Exhibit G to his second amended complaint reflecting the fact that Provident acquired competitor insurer Paul Revere in 1997 and revised Paul Revere's claim procedures to comport with Provident's nefarious procedures.

(Doc. 19-7 at 5). In 1999, Provident also merged with competitor insurer UNUM and similarly revised UNUM's claim procedures to comport with Provident's procedures. (Doc. 19-7 at 5). Therefore, Rosen successfully pleads an acquisition injury under § 1962(b) separate and distinct from Provident's alleged underlying scheme.

### CONCLUSION

For the reasons detailed above, the court will by separate order deny defendant's motions for partial summary judgment and for judgment on the pleadings, and will deny plaintiff's motion to strike the Kaminski declaration.

DONE this 21st day of January, 2015.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

31